Good morning, Your Honors. My name is Joyce Leavitt, and I represent the appellant in this case, Zuberi Steel. Can you move that microphone closer to you? Thank you. I'm sorry. Is that better, Your Honor? Yes. Okay. I'd like to reserve three minutes for rebuttal. Your Honors, we are asking Your Honors to reverse the District Court finding in this case for a number of reasons. First, at the time that the officer attempted to stop Mr. Steel, at the very beginning, there was no reasonable suspicion to believe that he had committed or was about to commit any crime. As the officers described, Your Honor, they approached a group of men. They saw something that looked like people were playing dice, and so they stopped them to investigate gambling. But as the statute says, and this is a misdemeanor offense, this is not a crime unless there is betting going on. It's not a crime to roll dice. And the officers don't say anything about seeing money exchanged or anything indicating gambling. And the officers also don't ---- At the testimony, the officer didn't say that? No. The officers only discussed seeing the men leaning over as if they were throwing dice. But they didn't say anything about seeing money exchanged. They said they were going to investigate gambling. Right. Gambling presumes that there's betting going on. It's not a crime to play dice. And there was no testimony that they saw money exchange hands, that they believed that they saw anything about gambling, or that in their experience as officers, they knew, for instance, that people who play dice are often gambling. But they were in a high-crime area. Is that correct? Yes, Your Honor. Testimony to that effect, and that these officers were patrolling in that area and knew that area well. So they saw seven men throwing dice. Yes. The inference that they were gambling was probably correct. Is that right? I don't believe so, Your Honor. And there was nothing to indicate they were gambling. The testimony about the high-crime area, Your Honor, actually dealt with dealing drugs and violence. And the officers admitted they didn't see anything that made them believe that there was drug dealing going on. They only stopped to investigate gambling. But what they thought was public gambling, to them, it appeared as public gambling. Yes, Your Honor. But there was no articulated facts. Let's move on to the next point. Okay. Thank you, Your Honor. I think just in light of your time, I'd like to hear the rest of your argument. Yes, yes. Thank you, Your Honor. So because there was no reason to stop Mr. Steele in the first place, because there was no reasonable suspicion to believe that gambling actually was going on, under the law, Mr. Steele was free to walk away and did not need to stop based on the request of the officer. Now, in this case, the court relied on other factors to find that there was reasonable suspicion, none of which, in my view, assists the case. The fact that it was a high-drug area or citizen complaints had been filed, again, that related to possible drug dealing in the area. But that information doesn't provide any support for the fact that there may have been gambling going on. The fact that Mr. Steele was walking away, under Supreme Court law and Ninth Circuit law, Mr. Steele is allowed to walk away. This wasn't a case where they said he was running. This isn't a case of headlong flight where cases have found there is reasonable suspicion, but rather he was walking away. Finally, Your Honors, the movement that the officer sees where, according to the officer, Mr. Steele puts his arm next to his side and presses in, this also does not present or provide reasonable suspicion to create the stop. Under Terry, you have to presume that there is a stop already in place, and then if somebody believes that a suspect is armed and dangerous, they could perhaps at most do a path search. But here Yes. There was testimony that an officer called out to him to stop. Yes, Your Honor. He responded he didn't hear it, or somebody else said that. And when he made his furtive movement, it was toward where people would ordinarily carry guns. Is that correct? Your Honor, one thing is the district court referred to it as a furtive movement. The officer never does. But, yes. Well, he described it, and then the district court characterized it as a furtive movement. Yes, Your Honor. What's the answer to that question, then? The question as to what happened, Your Honor, yes, is he called out, the officer called out. Mr. Steele continued to walk away as he was entitled to do, and he moved his elbow to his side. And I guess the question would be, if somehow reasonable suspicion were then created, I don't believe that it creates reasonable suspicion to now say maybe there was gambling, for instance, because that movement doesn't have the – there was testimony that people who gamble and play dice aren't more likely to carry guns. So I guess the question would be, would that movement on its own, if nothing else, then create reasonable suspicion to stop him and, if appropriate, to search him? Your Honor, I believe it doesn't. I believe that somebody walking, pushing his arm next to his side, absent any other reason to stop him, that in and of itself doesn't create reasonable suspicion to stop the individual. Hasn't this Court repeatedly held that furtive behavior may justify an officer's fear for his safety? Why would we depart from that principle in this case, where I know you challenged all the things leading up to it, but I think it's undisputed that your client made some movement in clutching gestures toward his side where one might carry a gun. Okay. So, Your Honor, two things. One is, again, whether that movement rises to the level of allowing the officer to then search him. One thing is that, in my view, at best what the officer comes up with is a hunch rather than a reasonable and articulable suspicion that, in fact, Mr. Steele was armed. He repeatedly in the reports talks about how there's an unknown object. He thinks there's something heavy, but he doesn't know what. He agrees that he couldn't see through the jacket, that he didn't see the outline of it, and when the officer asks him why he indicated that he didn't know what it was, he said he wasn't sure. He thought it could be possibly a weapon or contraband, and the Court found that he was not required to guess. But, Your Honors, when officers stop people, they are always making those kinds of decisions about whether there's reasonable suspicion, whether they can stop someone, whether they can search them. But quickly, Your Honors, even if Your Honors were to presume that Mr. Steele could be stopped and that the officer did have a reasonable suspicion, at most this then falls squarely within Terry. And under Terry, if an officer has a reasonable suspicion someone may be armed and dangerous, then he can pat search him. But before an officer can go further and handcuff him, the cases in this district show that there's got to be a lot more than just a reasonable suspicion of armed and dangerousness during the course of a Terry stop. The cases that the government cites all have facts where there's information ahead of time. For instance, the court, the case that the district court relied on, Batista, was a case where they knew that there were suspects in armed robbery. And in the Miles case, they knew that the men were accused of firing shots. And in the Buffington case, they thought that these were people were casing a bank. And they knew that the police knew that that person was violent. There hasn't been a case, Your Honors, where this Court has allowed handcuffing simply within a Terry stop to handcuffing if they believe it's armed and dangerous. The only exception is this Thompson case in which the individual is legitimately stopped. He was – didn't have ID. They took him out of the car, and they indicated to him that they were going to pat search him for his safety, and he kept reaching. And they warned him that if he didn't stop reaching, they were going to handcuff him. And he didn't stop. And so ultimately, they handcuffed him. That's the only case that I'm aware of, Your Honors, where handcuffing was okay absent some information ahead of time regarding the dangerousness. Finally, because I did want to preserve a little bit of time, the inevitable discovery would not save the search in this case. Why not? Your Honor, it would have been discovered in a pat-down. If there had been evidence in the record that, in fact, the officer was going to do a pat-down, then perhaps. And you think there wasn't enough evidence to support, based on the actions that occurred leading up to the handcuffing, that there wouldn't have resulted in at least a pat-down? Your Honors, I think it's the government's burden to put those facts in evidence. And in this case, the officer testified he handcuffs everybody. We know that. He violates the Fourth Amendment by handcuffing anyone he declares to be a suspect. He didn't say he pat searches everyone. He didn't say he would pat search someone. The cases are fairly narrow. And, Your Honor, So he would have just let him go? Or he would have not, not just, he would not have pat searched? That seems We don't have that information, Your Honor. And there are cases. One other thing, there are cases. We don't, because it wasn't presented. The other thing is there are cases where there are search warrants that could be obtained. The officers don't obtain those search warrants. All right. Thank you. Because I'll give you an additional minute and a half for rebuttal. Judge Nelson, do you have any other questions? None at this time. Judge Fletcher. Thank you. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, my name is Mary Jean Chan, and I represent the United States in this appeal. This Court should affirm the district court's denial of Mr. Steele's suppression motion. At the time of his seizure, which was at the time of the handcuffing, there was reasonable suspicion to believe that Mr. Steele was engaged in criminal activity and the use of handcuffs in effectuating that investigatory stop was reasonable under all the totality of circumstances, namely Mr. Steele's refusal to stop leaving the scene so that the investigatory stop could happen, his motion at his waist, which was suggestive of checking for a weapon, his refusal to make his hands visible to the officer, and also the context of the high-pride neighborhood, the known drug dealing and the gun violence that was known to have occurred frequently and recently in the vicinity. If we look to the Ninth Circuit cases, was there any information that the suspect was armed, currently armed? Was there any information that the officer had that the suspect was currently armed? That is one of the factors under Washington v. Lambert, Your Honor, and yes, there was. There was information, and the information was based upon the officer's visual observation of the suspect. Wait a minute. That's not the answer to my question. Was there any information that the officer had that the suspect was currently armed? Aside from the arm clenching, Your Honor? At the time he made the stop, did he have any information that had been relayed to him that the suspect was likely to be armed? I see. No. If I understand Your Honor's question, no. Did the cop follow a violent crime? No. Did the police have information that a crime that might involve violence was about to occur? No. And those are the factors considered by our Ninth Circuit cases, and that's why I pose those specifically. Of course. Therefore, your argument is that the officer was justified because? Well, Your Honor, the factors that you mentioned neglect one of the factors, which was very key in Washington v. Lambert, and that's at 98F3rd at page 1186, PIN site, and that is that he was uncooperative, and that is the first factor that is cited in Washington v. Lambert, and that is that Steele was uncooperative when the officer made eye contact with him. He started walking rapidly away as though he were going to run, walking rapidly away and then refused to stop despite the officer asking him to stop, and then refusing to make his hands shown, visible, when the officer asked him to do that. He ignored the officer's request repeatedly, and then following that, made this motion at his waist suggestive of a firearm, which was not independent prior information that he might be armed, but was consistent with being armed, and particularly so given that this was, and this is where the context of the high crime neighborhood comes into effect, because the officers knew that there was drug dealing in this neighborhood. In fact, there had been community reports about drug dealing on that specific block. They knew that drug dealing is often accompanied by weapons. The officer also knew that there had been a murder by handgun about five blocks away within the month, and had also stopped people who had been making that kind of a motion, who had turned out to have weapons or firearms at their waistband, and he himself, and I thought this was quite telling in the record, stated that he was a firearm carrying person himself as a police officer, and so he was particularly cognizant and familiar with the mannerisms of checking for a firearm. In fact, the district court specifically asked Officer Sanchez to demonstrate the motion, the clamping motion. That's at excerpts of record 133 to 134. The officer did so, and the district court credited his testimony. In fact, at excerpt of record 164, the district court said, there's certainly no basis for me not to believe his testimony. Now, I would like to address Ms. Leavitt's assertion that this officer just violated Fourth Amendment rights by handcuffing everybody. The officer specifically testified he did not do so, and when there was some suggestion that he did, he clarified at excerpts of record 127 that he only handcuffed all suspects where he thought there was probable cause to arrest them. So there was some confusion in the testimony, but he clarified that. So with respect to the ‑‑ So how many of the seven did he handcuff? Only one. He only ‑‑ and that's very key, because, in fact, the testimony was that of the seven people, the six people who stayed back with Officer Barossio, who complied with the investigatory stop, just stopped walking away and stayed around with him, it was all sort of an easy, easygoing encounter. Things only escalated when Officer Sanchez believed that perhaps Mr. Steele had a gun. And when he found, actually, that gun and he reported it to Officer Barossio, that's when things escalated. And, in fact, Mr. Steele's own witness, Sir Henry Anderson, testified that this was the case, that things got serious real fast, but only at the time that a firearm was found. And this is also key to why there was flight in this case. This is not headlong running away, but it was certainly flight in the definition or understanding of Illinois v. Wardlow, where the Supreme Court found that high crime neighborhood plus flight was reasonable suspicion to affect a stop, even if there was no reasonable suspicion of the illegal street gambling, which there was in this case. Mr. Steele walked away rapidly. The testimony by both officers was that after making eye contact with Officer Lopez, he took a hard step as though he were going to start running. Instead, he started walking rapidly. He kept looking back at Officer Sanchez, acknowledging, essentially, that Officer Sanchez was following him and asking him to stop and show his hands, but then ignoring those requests, ignoring those commands. And then the sequence of events was that it was escalating. Not only was he not stopping, he was not showing his hands, and then he was making a gesture that was consistent with perhaps accessing a weapon. This all created a legitimate fear for personal safety, as the district court found. And that, this Court has been absolutely clear, is a basis for using handcuffs during an investigatory stop, and it doesn't then escalate it or turn it into an arrest. Now, Ms. Levitt stated that this Court has never essentially found that the use of handcuffs is okay, absent probable cause for an arrest. But, in fact, all the cases, while there are differentiating factors, while there is sort of more suspicion of violence or violent armed robberies, those cases were all about whether an investigatory stop was, in fact, a stop or an arrest. And they all concluded that because of the fear for safety, personal safety, that those were, in fact, legitimate measures taken in the context of an investigatory stop and did not convert them to an arrest. And she did point out, and this is an instructive case, which is Thompson, that the officers were responding to a misdemeanor, a slight traffic violation of a taillight that was broken. And during that, the course of that, when the defendant in that case refused to stop reaching into his coat pocket, that was when the fear for personal safety allowed the officers to handcuff him in order to safely continue the stop and continue the encounter. There was reasonable suspicion of illegal street gambling. The officers saw people rolling dice. There was a configuration of men on a high-crime street where some people were squatting, some people were observing, and there was also the fact of the inclement weather. It's unusual for a group to be gathered outside when it's misty, and that's at Excerpts of Record 103. The group also dispersed at the approach of the officer, which this Court has said is also indicative of wrongdoing. The Community Reports of Crime on the Block is at Excerpts of Record 78. The officers specifically said that in their training experience, it looked like gambling. That's at Excerpts of Record 82, and that the configuration of the men was typical, quote, typical for a dice game. That's at Excerpts of Record 29. But even if you put aside illegal street gambling, there was reasonable suspicion, perhaps, that Mr. Steele was holding a concealed gun by the time he was actually stopped. This Court and the Supreme Court have been absolutely clear that until somebody submits to a stop, there is no seizure, there is no stop. So this Court can consider all the events, the totality of the circumstances, up to the time he was actually stopped, up to the time that Officer Sanchez laid hands on him and handcuffed him in order to conduct the investigatory stop. So this Court should affirm. I'd like to ask you about the inevitable discovery here. What evidence shows that it was inevitable that Mr. or Officer Sanchez would have conducted a pat-down search? Officer Sanchez testified that he was concerned that there was a concealed weapon, that there was a weapon at the waist, that he handcuffed him, and that before he was going to be able to pat him down, Mr. Steele then said in a downcast way, it's here on my right side, it's a gun. So the testimony was that he was about to go and conduct a pat-down search, but before he did, Mr. Steele admitted that he had a gun. I should also say that Mr. Steele, in his written confession, also stated that he had been standing on that street watching his friends play dice. So it's one of these situations where there was no probable cause to search the people who were hanging out to look for something as small as dice or cash. And because of the circumstances, it sort of became irrelevant because it was overshadowed by the safety concerns. But there was reasonable suspicion to conduct the stop. It would have been evidently found during a pat-down search, but in any case that handcuffing was also reasonable. Do you have any other questions? Judge Fletcher, do you have any other questions? No, I do. Thank you. Your Honors. You have a minute and a half. Your Honors, as Judge Nelson said, there was no information ahead of time that would have supported any belief that Mr. Steele was armed and dangerous. Under Florida v. Royer, he was allowed to walk away. The officers were clear. He wasn't running. He was walking. This is not a case where there was headlong flight. And ultimately, if Your Honors get to the point that he reasonably – that he – that this was a legitimate investigatory stop and he reasonably believed that Mr. Steele might be armed and dangerous, it's squarely within Terry. It's squarely within Terry, and at best, a pat search was warranted. Now, the Thompson case was different only because the officers were pat searching that individual, and he kept reaching, and they said, warned him, if you don't stop that, we're going to handcuff you. Other than that, all of the other cases, Your Honor, have information ahead of time, investigating a robbery, knowing the individual is dangerous, things like that. And that is simply not here. So at best, at best, they should have pat searched him. And they didn't. They handcuffed him. The officer handcuffed him in a situation that did not rise any more above Terry. There was no evidence in this case that he was reaching for a weapon. In fact, the officers specifically said he wasn't. And ultimately, Your Honors, in terms of the inevitable discovery, it's not applicable in this case. The cases are fairly limited when those cases have been applied. Under Ramirez v. Sandoval, even though they stopped a van and they could have questioned the individuals and they probably would have given them the same information, they didn't. They did an illegal search and then got information. Here – yes, Your Honors. Thank you very much. Appreciate it. Both your arguments well presented. Thank you very much. We'll be in recess. Thank you. All rise. And just for the record, I think I need to say that all the cases are submitted now. Thank you.
judges: Fletcher, Nelson, Murguia